FILED
2021 Sep-30  PM 12:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **STEPHEN CHANCY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  6:20-cv-00326-MHH** |
| | } | |
| **KILOLO KIJAKAZI,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,[1]** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C.  §§ 405(g) and 1383(c), plaintiff Stephen Chancy seeks judicial review of a final partially favorable decision of the Commissioner of Social Security.  The Commissioner denied Mr. Chancy's claim for a period of disability and disability insurance benefits, finding that Mr. Chancy was not disabled between January 3, 2012, his alleged disability onset date, and December 31, 2016, his date last insured.  The Commissioner found that Mr. Chancy became disabled on July 14, 2017, so he became qualified for supplemental security income on that date.  After

---

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Andrew Saul as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

careful review, the Court reverses the Commissioner's decision regarding her disability findings for the period from January 2012 to December 2016.

**Procedural Background**

Mr. Chancy initially applied for a period of disability and disability insurance benefits on September 10, 2013. (Doc. 8-10, p. 35). Mr. Chancy alleged that his disability began on January 3, 2012. (Doc. 8-7, p. 2; Doc. 8-10, p. 26). The Commissioner denied Mr. Chancy's initial application on January 9, 2014. (Doc. 8-5, p. 2). Mr. Chancy requested a hearing before an Administrative Law Judge – an ALJ. (Doc. 8-5, p. 78). The ALJ issued an unfavorable decision on November 14, 2014. (Doc. 8-11, pp. 2-4; Doc. 8-3, pp. 10-12). On March 23, 2016, the Appeals Council declined Mr. Chancy's request for review, making the Commissioner's decision final. (Doc. 8-3, pp. 2-4, 8). Mr. Chancy then sought judicial review under 42 U.S.C. § 405(g) § 1383(c) on May 5, 2016. (Doc. 8-11, pp. 23-65).

On January 18, 2018, this Court remanded Mr. Chancy's application to the Commissioner, stating, that "the ALJ's reasoning is not sufficient to support a determination that good cause exists to accord little weight to Dr. Mosley's opinions and statements. …. On remand, the ALJ will be required to further evaluate all of the evidence, which will require a reassessment of Chancy's credibility." (Doc. 8-

11, pp. 53, 62).[2]   The Appeals Council vacated the adverse decision and remanded Mr. Chancy's 2013 application to the ALJ for proceedings consistent with this Court's order.  By 2018, Mr. Chancy had filed another application under Title II and Title XVI, seeking disability benefits and supplemental security income.  (Doc. 8-11, p. 75).[3]   The Court has not been able to locate the application in the administrative record, but the Appeals Council indicated in its remand order that Mr. Chancy's second application is dated April 12, 2016.  (Doc. 8-11, p. 75).  The Appeals Council directed the ALJ to consolidate Mr. Chancy's old and new applications, stating:  "the Administrative Law Judge will consolidate the claims files, associate the evidence, and issue a new decision on the consolidated claims." (Doc. 8-11, p. 75) (citations omitted).

---

[2] The Honorable John E. Ott presided over the case and issued a 43-page opinion and a two-page order on January 18, 2018.  (Doc. 8-11, pp. 23-67).

[3] "The Social Security Administration (SSA) administers two programs that provide benefits based on disability: the Social Security disability insurance program (title II of the Social Security Act (Act)) and the Supplemental Security Income (SSI) program (title XVI of the Act).

Title II provides for payment of disability benefits to disabled individuals who are "insured" under the Act by virtue of their contributions to the Social Security trust fund through the Social Security tax on their earnings, as well as to certain disabled dependents of insured individuals. Title XVI provides SSI payments to disabled individuals (including children under age 18) who have limited income and resources."

https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Sept. 29, 2021).

On November 27, 2018, the ALJ held a hearing on Ms. Chancy's benefit applications. During the hearing, she asked Mr. Chancy: "why did you not apply for Supplemental Security Income?" (Doc. 8-10, p. 53). The ALJ remarked to Mr. Chancy: "you did not apply for a Supplemental Security Income." (Doc. 8-10, p. 54). Consequently, Mr. Chancy filed another application for SSI on November 27, 2018. (Doc. 8-13, pp. 17-22). In it, he alleged a disability onset date of January 3, 2012. (Doc. 8-13, p. 17). On January 16, 2019, the ALJ issued a partially favorable opinion, finding that Mr. Chancy was disabled beginning July 14, 2017 but not before that date. Consequently, the ALJ stated, Mr. Chancy was eligible for SSI benefits but not for disability benefits because he was last insured, for purposes of Title II, on December 31, 2016. (Doc. 8-10, pp. 22-23, 33-34).

On March 5, 2019, Mr. Chancy asked the Appeals Council to review the ALJ's 2019 decision. The Appeals Council replied, explaining that Mr. Chancy appeared to have waited too long to file exceptions to the ALJ's decision. The Appeals Council gave Mr. Chancy the opportunity to demonstrate that he had filed exceptions within 30 days of the ALJ's decision. (Doc. 8-10, pp. 9-10). In a letter dated May 9, 2019, Mr. Chancy's attorney responded to the Appeals Council, explaining that his request for review on behalf of Mr. Chancy was late because his law partner had been out of the office with a serious illness that required hospitalization. (Doc. 8-10, pp. 6-7). On February 8, 2020, the Appeals Council

responded, noting that SSA rules state that exceptions to an ALJ's decision must be filed within 30 days, and the rules do not provide a good cause exception for late filing.  (Doc. 8-10, p. 2).  The Appeals Council stated that Mr. Chancy's attorney did not send exceptions or ask for more time to do so within 30 days of the ALJ's decision.  (Doc. 8-10, p. 2).

On March 10, 2020, Mr. Chancy filed a petition in this Court seeking judicial review of the ALJ's decision.  (Doc. 1; Doc. 8-10, p. 2).[4]

## Standard of Review

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [her] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, a district court may

---

[4] The parties agree that the discussion in the Appeals Council regarding the timeliness of Mr. Chancy's request for review does not affect the timing of Mr. Chancy's petition in this Court. (Doc. 14, p. 2; Doc. 20, p. 3).

not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## Statutory and Regulatory Framework

To be eligible for disability benefits or SSI, a claimant must be disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12

months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[5]   A

claimant must prove that he is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing

*Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that he is disabled, an ALJ

follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a residual functional capacity ("RFC")
> assessment, whether the claimant can perform any of his or her past
> relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the claimant
> can perform given the claimant's RFC, age, education, and work
> experience.

*Winschel*, 631 F.3d at 1178.  "The claimant has the burden of proof with respect to

the first four steps."  *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37

(11th Cir. 2009).  "Under the fifth step, the burden shifts to the Commissioner to

---

[5] "For all individuals applying for disability benefits under title II, and for adults applying
under title XVI, the definition of disability is the same."

https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Sept. 29,
2021).

show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Because Mr. Chancy seeks disability insurance benefits, the ALJ had to determine whether Mr. Chancy was insured when he became disabled.  (Doc. 8-10, p. 24).  "For SSI claims, a claimant becomes eligible in the first month where she is both disabled and has an SSI application on file." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing 20 C.F.R. § 416.202–03 (2005)).

## The Administrative Law Judge's Findings

On November 27, 2018, the ALJ found that Mr. Chancy met the insured status requirements for disability insurance benefits through December 31, 2016.  (Doc. 8-10, p. 24).  The ALJ determined that Mr. Chancy had not engaged in substantial gainful activity since January 3, 2012, the alleged onset date.  (Doc. 8-10, p. 24). The ALJ determined that Mr. Chancy suffered from the following severe impairments:  degenerative disc disease and degenerative joint disease.  (Doc. 8-10, p. 24).  Mr. Chancy has the non-severe impairment of hypertension.  (Doc. 8-10, p. 25).  Based on a review of the medical evidence, the ALJ concluded that Mr. Chancy did not have an impairment or a combination of impairments that meets or medically

equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart

P, Appendix 1.  (Doc. 8-10, p. 25).[6]

With these impairments in mind, the ALJ evaluated Mr. Chancy's residual

functional capacity.  The ALJ determined that, prior to July 14, 2017, the date Mr.

Chancy became disabled, Mr. Chancy had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except the claimant can occasionally balance, stoop, kneel, crouch,
> crawl, and climb ramps and stairs.  The claimant must avoid overhead
> reaching with his upper extremities.   The claimant should avoid
> concentrated exposure to extreme heat, cold, and vibrations.  He should
> avoid all exposure to unprotected heights.

(Doc. 8-10, p. 26).  "Light work involves lifting no more than 20 pounds at a time

with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though

the weight lifted may be very little, a job is in this category when it requires a good

deal of walking or standing, or when it involves sitting most of the time with some

pushing and pulling of arm or leg controls."  20 C.F. R. § 404.1567(b).  "If someone

can do light work, . . . he can also do sedentary work, unless there are additional

limiting factors such as loss of fine dexterity or inability to sit for long periods of

time."  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no more than 10

---

[6] The regulations governing the types of evidence that a claimant may present in support of his
application for benefits or that the Commissioner may obtain concerning an application and the
way in which the Commissioner must assess that evidence changed in March of 2017.  *See*
Revisions to Rules Regarding the Evaluation of Medical Evidence; Correction, 82 Fed. Reg.
15,132 (Mar. 27, 2017).  Because Mr. Chancy filed his applications for benefits before March 27,
2017, the new regulations, found at 20 C.F.R. §§ 416.913 and 416.920c, do not apply to his case.
*See Morgan v. Comm'r of Soc. Sec.*, 760 Fed. Appx. 908, 911 n.2 (11th Cir. 2019).

pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria is met."  20 C.F.R. § 404.1567(a).

Based on Mr. Chancy's RFC, the ALJ found that Mr. Chancy was not able to perform his past relevant work as a dump truck driver and material handler.  (Doc. 8-10, p. 32).  Relying on testimony from a vocational expert, the ALJ found that, prior to July 14, 2017, there were jobs that existed in significant numbers in the national economy that Mr. Chancy could have performed, including garment sorter (DOT 222.687-014), filler (DOT 780.684-066 light), and seconds handler (DOT 782.687-050).  (Doc. 8-10 p. 33).  Accordingly, the ALJ determined that Mr. Chancy was not under a disability within the meaning of the Social Security Act at any time through December 31, 2016.  (Doc. 8-10, p. 33).  As of July 14, 2017, there are no jobs that exist in significant numbers in the national economy that Mr. Chancy can perform.  (Doc. 8-10, p. 33).[7]

---

[7] The ALJ determined that beginning on July 14, 2017, Mr. Chancy could perform light work, but a finding of disabled is directed by Medical Vocation Rule 202.06 because he could not perform the work with his attendance limitations.  (Doc. 8-10, p. 33).

**Analysis**

Mr. Chancy argues that he is entitled to relief from the ALJ's decision because the ALJ's finding that he could perform light work is not supported by substantial evidence. Mr. Chancy also argues that the ALJ did not apply the correct legal standards. And he argues that the medical records on which the ALJ based her finding of disability as of July 2017 are completely consistent with his earlier medical records, which the ALJ found do not support a finding of disability. (Doc. 14). The Court begins its analysis with a review of the medical evidence and the administrative hearing. Then, the Court considers Mr. Chancy's arguments.

*Mr. Chancy's Medical Records*

Dr. Jason Banks began treating Mr. Chancy after Mr. Chancy injured his back in a rollover motor vehicle accident in January of 2012 as the driver of an 18-wheeler truck. (Doc. 8-8, p. 86).[8] Dr. Banks's January 19, 2012 notes indicate that Mr. Chancy's neck was "tender in the posterior midline around the C6-7 region," and his movement was limited because of back pain. (Doc. 8-8, pp. 84-85). Dr. Banks diagnosed Mr. Chancy with a T12 fracture compression. (Doc. 8-8, p. 86). Dr. Banks saw Mr. Chancy again on February 8, 2012. Mr. Chancy complained of numbness and tingling in his left arm and "significant" pain in his back. Dr. Banks

---

[8] Mr. Chancy was hospitalized for eight days following the accident. (Doc. 8-8, p. 86).

prescribed Norco 10 every four hours and Skelaxin.  (Doc. 8-8, p. 37).  Mr. Chancy's February 13, 2012, MRI showed post-surgical changes related to a prior fusion at C6-7; moderate cervical degenerative change above and below the level of fusion at C5-6 and C7-T1 and main level cervical degenerative change; borderline versus mild canal narrowing at C5-6 and C7-T1; moderate left foraminal narrowing at C5-6 and moderate right foraminal narrowing at C7-T1, mild to moderate left foraminal narrowing suggested at C7-T1 and mild right foraminal narrowing suggested at C5-6; and mild facet arthropathy at T1-2.  No significant nerve or spinal cord compression was identified.  (Doc. 8-8, p. 66).

During his February 20, 2012 visit with Dr. Banks, Mr. Chancy reported symptoms of fatigue, blurred or double vision, sleep apnea, nausea or vomiting, constipation, joint pain, joint stiffness or swelling, joint weakness, muscle pain or cramps, difficulty walking, headaches, dizziness, balance problems, numbness, memory loss or confusion, sleep problems, depression, pain in his left hip, trouble sleeping, suicidal thoughts, and mood changes.  Mr. Chancy also reported that he had fallen three times because he lost his balance.  (Doc. 8-8, p. 41).  Based on his review of Mr. Chancy's MRI, Dr. Banks noted that Mr. Chancy had "prior 6-7 fusion with adjacent level disease at C5 and C6, worse towards the left, and also some broad based disk bulging at C7 and T1, no significant nerve or spinal cord compression seen," and "numbness and tingling in left arm could be related to the 5-6 disk

herniation." (Doc. 8-8, p. 36).

At Mr. Chancy's March 7, 2012 visit, Dr. Banks noted Mr. Chancy's continued complaints of pain in his left arm with numbness and tingling and restated his findings from Mr. Chancy's MRI. (Doc. 8-8, p. 35). Dr. Banks noted that Mr. Chancy had "an area of palpable tenderness of his kyphotic deformity related to his fracture." Mr. Chancy was "able to ambulate with a walker and, overall, appears [to be] feeling better." Dr. Banks prescribed Mobic, a Medrol Dosepak, pain medications, and muscle relaxers. (Doc. 8-8, p. 35).

During Mr. Chancy's April 9, 2012 visit with Dr. Banks for a follow-up for his "T11-12 burst fractures," Mr. Chancy reported pain at a 6/10 level, but Dr. Banks noted that "[o]verall he appears that he is feeling much better" and noted that "[h]is neurological examination is completely intact. He can bend slightly forward with minimal pain." (Doc. 8-8, p. 34). Dr. Banks recommended that Mr. Chancy continue pain management. Dr. Banks also prescribed physical therapy, refilled Mr. Chancy's Norco prescription, and noted that Mr. Chancy was experiencing gastritis and stomach pain because of his medications. (Doc. 8-8, p. 34).

On May 21, 2012, Dr. Banks wrote in a letter to Dr. Mosley, Mr. Chancy's primary care physician, that Mr. Chancy was still experiencing back pain and numbness and tingling in his left arm, but that Mr. Chancy denied "any significant pain or weakness in his legs." (Doc. 8-8, p. 33). Mr. Chancy reported that he was not able to walk

outside "for more than five minutes without excruciating back pain." (Doc. 8-8, p. 33). Dr. Banks remarked that he felt Mr. Chancy would improve and that Mr. Chancy was walking with a cane but did not require a cane because he walked independently in the examination room. (Doc. 8-8, p. 33). Dr. Banks also remarked that Mr. Chancy was wearing a brace, but Dr. Banks recommended that Mr. Chancy wean himself from it. (Doc. 8-8, p. 33). Dr. Banks's review of Mr. Chancy's x-rays showed "a stable fracture without any changes." (Doc. 8-8, p. 33). Dr. Banks wrote that Mr. Chancy might be close to his maximum medical improvement. (Doc. 8-8, p. 33).

On July 5, 2012, Mr. Chancy returned to Dr. Banks, complaining of continued back pain despite taking Percocet 10 up to four times a day. Dr. Banks noted Mr. Chancy still had difficulty with range of motion, and he was "minimally tender to palpation." (Doc. 8-8, p. 32). His motor reflex and sensory examination was normal. (Doc. 8-8, p. 32). Dr. Banks noted that Mr. Chancy "[was] not making rapid improvements," but Dr. Banks believed Mr. Chancy was "far enough out that he should start to get some relief." (Doc. 8-8, p. 32). Dr. Banks decided to "hold off on ... physical therapy and set him up with anesthesia for pain management injections," and Dr. Banks provided Mr. Chancy with a Percocet prescription until he was able to see "anesthesia for pain management."  (Doc. 8-8, p. 32). Dr. Banks suspected that Mr. Chancy's "problems with his narcotics is related to his previous addiction

and we will not be able to sustain this indefinitely." (Doc. 8-8, p. 32).

Mr. Chancy began seeing Dr. Marion Sovic with Pain Management Services, P.C. on July 24, 2012. (Doc. 8-9, p. 192). Mr. Chancy reported that a pain block performed by Dr. Banks did not help, and he continued to have pain in his lower and middle back. Mr. Chancy reported that "any kind of bending or walking increases the pain, not much decreases the pain." (Doc. 8-9, p. 192). According to Dr. Sovic's notes, Mr. Chancy had prescriptions for Oxycodone, Norco, Protonix, and Atenolol, and Mr. Chancy was "unable to flex and extend to any significant degree in his lower extremities." (Doc. 8-9, p. 192). Dr. Sovic prescribed 10 mg of Percocet and set up a block for Mr. Chancy's lower back with a follow-up in one month. (Doc. 8-9, p. 193).

On August 14, 2012, Dr. Sovic noted that Mr. Chancy continued to complain about lumbar pain. (Doc. 8-9, p. 182). Mr. Chancy stated that his pain was 7/10. Dr. Sovic continued Mr. Chancy on Percocet, added a prescription for Ambien, and made Mr. Chancy aware that he was "more than welcome to have a block done for the lumbar pain." (Doc. 8-9, pp. 182-83). On September 8, 2012, following two blocks, Dr. Sovic documented that Mr. Chancy still was experiencing mid-thoracic and lower back pain at level 5/10. Mr. Chancy continued to take Zanaflex, Ambien, and Percocet for pain. (Doc. 8-9, p. 172).

On September 24, 2012, Mr. Chancy visited Dr. Banks with complaints of

"continued pain in his back."  (Doc. 8-8, p. 31).   According to Mr. Chancy, the pain

had increased over the previous three or four weeks.  Mr. Chancy reported that he

could not walk to the mailbox without having to rest for an hour after trying.  Dr.

Banks noted, "[n]eurologically, he is unchanged, which shows that range of motion

is difficult in his back and range of motion of his neck is satisfactory." (Doc. 8-8, p.

31).  After reviewing x-rays, Dr. Banks found that Mr. Chancy's fracture was stable,

and an MRI of Mr. Chancy's cervical spine showed "cervical spondylitic disease at

C5-6 and C6-7.  There is a fusion at C6-7.  To the right at C7-T-1, there is some bony

osteophylic disease present, however, there is absolutely no core compression

whatsoever and there is no signal change seen."  (Doc. 8-8, p. 31).  Dr. Banks

believed that surgery would not benefit Mr. Chancy.  Dr. Banks set up a functional

capacity evaluation and impairment rating regarding Mr. Chancy's back and neck

and recommended that Mr. Chancy follow up with Dr. Sovic for pain management.

(Doc. 8-8, p. 31).

On October 30, 2012, Dr. Sovic performed a block on Mr. Chancy.  Dr. Sovic

noted that he had been treating Mr. Chancy since July 2012, and Mr. Chancy had

received three blocks with only intermittent pain relief.  Mr. Chancy reported that

he was experiencing pain at a level of 7/10.  Dr. Sovic noted that he did not have

suggestions for pain relief for Mr. Chancy other than pain medication and blocks.

(Doc. 8-9, pp. 161-62).

On November 5, 2012, Dr. Banks reported that Mr. Chancy's functional capacity evaluation "was potentially an invalid test and because of this I will release him back to work with medium duty restrictions."  (Doc. 8-8, p. 30).  Dr. Banks opined that Mr. Chancy was at maximal medical improvement with PPI and that he agreed with Mr. Chancy's whole person impairment of 15%.  (Doc. 8-8, p. 30).

Mr. Chancy had an MRI on January 22, 2013.  The MRI showed: a prior cervical fusion at C6-C7, a diffuse disc bulge at C7-T1, an old T12 compression fracture, and a diffuse disc bulge at T11-T12.  (Doc. 8-8, p. 73).  Dr. Sovic reviewed Mr. Chancy's MRI on February 12, 2013 and noted that the MRI showed "an anular disc bulge causing essentially complete effacement of the CSF space above the cord at T11/12."  (Doc. 8-9, p. 156).  Mr. Chancy reported that his pain level was 9/10. Dr. Sovic and Mr. Chancy discussed the possibility of seeing a surgeon.  (Doc. 8-9, p. 156).

During his next visit with Dr. Banks on February 20, 2013, Mr. Chancy continued to complain of neck and lower back pain. Dr. Banks reviewed Mr. Chancy's MRI and noted that he did not find the MRI helpful because it was unclear. (Doc. 8-8, p. 29).  Dr. Banks recommended additional testing to determine whether Mr. Chancy had significant stenosis, including a myelogram and postmyelogram CT scan of the entire neural axis.  (Doc. 8-8, p. 29).

Mr. Chancy visited Dr. Banks on March 4, 2013, for a myelogram with

complaints of "neck and shoulder pain, arm issues, and thoracic stenosis." (Doc. 8-8, p. 54). Dr. Banks documented Mr. Chancy's medical history, including "T9, T10, T11, and T12 fractures, migraines, hypertension, heart disease, chronic fatigue." (Doc. 8-8, p. 54). Dr. Banks noted that Mr. Chancy was still wearing a back brace, and Mr. Chancy reported that he still was experiencing considerable pain. (Doc. 8-8, p. 54).

During a March 7, 2013 visit with Dr. Banks, Mr. Chancy complained of "pain in his neck and left shoulder into his left arm with some numbness in his index finger, but also includes the other fingers as well." (Doc. 8-8, p. 28). Dr. Banks found that it was "difficult to elicit reflexes in [Mr. Chancy's] upper extremities," and Mr. Chancy felt "like he is somewhat weaker in his left leg secondary to some pain in his hip." (Doc. 8-8, p. 28). Dr. Banks noted that a "[r]eview of his cervical myelogram and postmyelogram CT reveals evidence of bony osteophytic disease and possibly a disc herniation to the left at C5-C6. This is above his level of fusion that he has had at C6-C7. There is almost complete obliteration of the cervical nerve root on that side." (Doc. 8-8, p. 28). Dr. Banks continued, "I let him know that his back has healed as well as it is going to. I know he still has pain, although I do not feel that surgery is going to be of benefit to help relieve this at all. I feel that he is at maximum medical improvement with regard to his lumbar spine." (Doc. 8-8, p. 28). Dr. Banks recommended that Mr. Chancy undergo an anterior cervical

discectomy and fusion from the right side due to "a disc osteophyte complex to the left and possibly an acute disc herniation at C5-C6 causing a C6 radiopathy" and for Mr. Chancy to see an orthopedic doctor for his left hip and left shoulder.  (Doc. 8-8, p. 28).

On March 12, 2013, Mr. Chancy visited Dr. Sovic for the significant pain he was experiencing.  Mr. Chancy reported pain at level 8/10.  Dr. Sovic recommended surgical evaluation for the "anular bulge causing some effacement of the CSF space at T11/12."  Dr. Sovic stated that "there is no surgery indicated for [Mr. Chancy's] thoracic region."  (Doc. 8-9, p. 154).

On March 19, 2013, Dr. Michael Cantrell of the Orthopedic Center saw Mr. Chancy for shoulder and hip pain. (Doc. 8-9, p. 13).  Mr. Chancy reported pain at a level of 9/10 in his shoulder and hip.   Dr. Cantrell documented Mr. Chancy's neurologic symptoms of tingling and numbness in his left hand.    Dr. Cantrell's impressions were "left shoulder pain with AC joint arthrosis and possible rotator cuff tear" and "left hip pain, SI joint origin." (Doc. 8-9, p. 13).  Dr. Cantrell thought Mr. Chancy's hip would be "better treated by another physician" and recommended that Mr. Chancy first address his cervical spine issues to see if that treatment would help Mr. Chancy's shoulder pain.  (Doc. 8-9, pp. 13-14).  During an April 2, 2013 follow-up visit, Dr. Cantrell again recommended conservative management of Chancy's shoulder, but "once his cervical spine surgery is performed and he is recovered if his

shoulder is persistently painful, we will consider surgical treatment with regards to the shoulder." (Doc. 8-9, p. 11). Dr. Cantrell referred Mr. Chancy to a physiatrist for hip and SI joint pain. (Doc. 8-9, p. 11).

On April 9, 2013, Mr. Chancy visited Dr. Sovic. Mr. Chancy reported "shoulder, neck, and also upper extremity pain" at a level of 8/10. Dr. Sovic discussed weaning Mr. Chancy from narcotics, stating, "the patient has truly not improved with blocks and has not improved with narcotics and therefore, at this point I will start weaning the narcotics since these have not been effective." (Doc. 8-9, p. 153).

On April 26, 2013, Dr. Banks performed the anterior cervical discectomy and fusion from the right-side procedure that he had recommended for Mr. Chancy. (Doc. 8-8, p. 45). At a follow up visit on May 20, 2013, Dr. Banks stated that Mr. Chancy could "remain off work" and that he suspected Mr. Chancy "will meet maximal medical improvement upon his next visit." (Doc. 8-8, p. 161). Dr. Banks also noted that there had been "no significant changes in [Mr. Chancy's] pain level." (Doc. 8-8, p. 161). Dr. Banks recommended Mr. Chancy return to Dr. Cantrell to see if more could be done for his left shoulder pain. (Doc. 8-8, p. 161).

On May 28, 2013, Mr. Chancy visited Dr. Sovic; his pain level was 9/10. (Doc. 8-9, p. 152). Dr. Sovic noted that Mr. Chancy had undergone three blocks since July 2012, which brought "some intermittent relief but not long-lasting." (Doc. 8-9, p.

152).

On May 31, 2013, Dr. Cantrell noted that the cervical spine surgery had not improved Mr. Chancy's shoulder pain.  (Doc. 8-9, p. 326).  Dr. Cantrell opined that surgery would "not resolve his upper left extremity pain with paresthesias" but would "likely help his discrete shoulder pain."  (Doc. 8-9, p. 8).

On June 25, 2013, Dr. Cantrell performed a "left shoulder arthroscopy, debride SLAP, debride rotator cuff, decompression, distal clavicle resection, and biceps tenodesis" on Mr. Chancy.  (Doc. 8-9, pp. 5, 18-19).  Physical therapy reports from Drayer Physical Therapy Institute show that Mr. Chancy's pain limited his ability to regain strength and range of motion.  (Doc. 8-9, pp. 26-29, 44-45).  On August 1, 2013, Mr. Chancy reported to his physical therapist that he had "all the time pain" in his left shoulder and arm that caused him to be unable to sleep.  Mr. Chancy stated that activities made the pain worse.  (Doc. 8-9, p. 75).

During an August 5, 2013 visit, Dr. Banks noted "tenderness over [Mr. Chancy's] left sacroiliac joint" and found that Mr. Chancy had "difficulty flexing his left hip due to sacroiliac joint pain."  (Doc. 8-8, p. 159).  Mr. Chancy complained to Dr. Banks "that his back pain ha[d] become more severe."  (Doc. 8-8, p. 159).  Dr. Banks noted that Mr. Chancy's "upper left extremity function [was] immobilized but he [could] grip and extend his hand.  He has numbness in a nondermatomal distribution but his biceps, triceps, and deltoid strength was not assessed secondary

to shoulder immobilization." (Doc. 8-8, p. 159). Dr. Banks wrote that Mr. Chancy's recent x-rays showed that Mr. Chancy's hardware at the C5-6 region appeared to be stable, and there was no evidence of complications or "other obvious bony abnormalities." (Doc. 8-8, p. 160). Dr. Banks's impressions were "sacroiliac joint syndrome," "T12 burst fracture treated expectantly and at maximum medical improvement," and "cervical radiculopathy status post anterior cervical discectomy and fusion at C5-6." (Doc. 8-8, p. 159). Dr. Banks stated that Mr. Chancy should continue his shoulder therapy with Dr. Cantrell. Dr. Banks concluded that he did not need to see Mr. Chancy again from a "cervical standpoint" because "[h]e has reached maximum medical improvement at this time." (Doc. 8-8, p. 159).

On August 13, 2013, Dr. Sovic noted that Mr. Chancy continued to use Tylenol No. 3, Zanaflex, and Ambien. (Doc. 8-8, p. 197). Mr. Chancy's reported his pain level as 6/10. Dr. Dovic's system review revealed "some joint pain, stiffness and back pain, muscles aches and loss of strength," and her neurologic examination showed "poor balance, numbness, and tingling." (Doc. 8-8, p. 197). Dr. Sovic assessed "thoracic pain and also left SI joint pain." (Doc. 8-8, p. 197).

On August 27, 2013, Mr. Chancy reported to his physical therapist that his shoulder pain interfered with normal activities and that he was unable to work or perform daily activities because of his shoulder. Mr. Chancy had "severe" pain and tingling, and there was so much pain in his shoulder that he could not sleep. Mr.

Chancy rated his worst pain that week as 10/10.  (Doc. 8-8, pp. 38-39).

On September 16, 2013, Mr. Chancy had a follow-up visit with Dr. Cantrell. Dr. Cantrell reported that Mr. Chancy was progressing nicely.  His shoulder was much better than before the surgery.  (Doc. 8-9, p. 5).  Mr. Chancy completed physical therapy for his shoulder a few days later.  (Doc. 8-9, p. 23).

Dr. Brian Carter completed a Functional Capacity Evaluation or FCE on Chancy on September 27, 2013.   Dr. Carter documented the findings of Mr. Chancy's physical exam as follows:

> CERVICAL: He has some mild tenderness across the cervical paraspinal and trapezial area. Spurling's maneuver is negative.  He has some slight range of motion deficits in all planes including cervical rotation which is a bit unusual since the vast majority of the motion occurs at CC: . c2.

> THORACIC: Normal range of motion. No abnormalities.  Nontender palpation.  Paraspinal muscles normal in tone.

> LUMBAR: Range of motion in the lumbar spine is normal in all directions.  The spine is nontender and paraspinal muscles are normal in tone.  Straight leg raising leg raising test is negative. Femoral stretch is negative.  There is no leg length discrepancy present.  The sacroiliac joints and PSIS are nontender to palpation. Hamstrings are normal in tone.
> … .
> EXTREMETIES: Examination of the left shoulder reveals some mild tenderness across the AC joint and biceps tendon insertion. Range of motion measurements performed today show flexion 130 degrees, extension 30 degrees, shoulder abduction 130 degrees, shoulder abduction 20 degrees, internal rotation 50 degrees, and external rotation 80 degrees.

. . . .

DISCUSSION

. . . .

Combining whole person impairments for the cervical spine and the left shoulder this adds up to 15% whole person impairment according to the Combined Values Chart. When this is combined with his previously assigned 15% impairment for his T12 compression fracture, this translates to a total whole person impairment of 28%. I believe this is valid and accurate representation of the patient's current impairment.

We now turn our attention to the Functional Capacity Evaluation. Overall Mr. Chancy tested level for an eight hour day according to the Dictionary of Occupational Titles, U.S. Department of Labor, 1991. The Claimant's Acculift profile demonstrated consistent effort.

(Doc. 8-9, pp. 90-93). Dr. Carter noted that Mr. Chancy reported that he was "doing fairly miserable overall. He notes constant neck and shoulder pain as well as mid-back and hip area pain." (Doc. 8-9, p. 90).

On December 7, 2013, Alabama Disability Determination Services consultant Dr. Annie L. Harris examined Mr. Chancy. She found, in pertinent part, that Mr. Chancy suffered from "[s]evere low back pain ... [s]econdary to spinal fractures for [an] 18 wheeler accident." (Doc. 8-9, p. 102). "His [pain] is severe and worsened with essentially any movement except lying down with cushions. Pain is also in left hip which occasionally causes him to fall when his leg 'gives out.'" (Doc. 8-9, p. 102). Dr. Harris noted that Mr. Chancy's lumbar spine and hip range of motion or ROM was "incompletely assessed." (Doc. 8-9, p. 102). Dr. Harris found that Mr. Chancy had normal range of motion in all joints with the following exceptions:

1.   Decreased forward shoulder evaluation (130 bilaterally). Otherwise, bilateral ROM was normal.

2.   Decreased cervical spine flexion (35). Otherwise, cervical spine ROM was normal.

3.   Lumbar forward and lateral flexion were unable to be assessed because the patient refused secondary to back pain.

4.   Decreased hip flexion (right 80, left 70). Hip internal rotation was unable to be assessed secondary to pain. Hip external rotation and abduction were normal bilaterally.

5.   Knee flexion was decreased on the right (100) but normal on the left.

6.   Supine and straight leg raise tests were not obtained because patient would not lie flat or sit in proper positioning.

(Doc. 8-9, p. 102). Dr. Harris stated that Mr. Chancy had "[d]ecreased muscle strength ... from pain with movements." (Doc. 8-9, p. 102). In the physical examination portion of her evaluation, Dr. Harris stated that Mr. Chancy "was able to ambulate with mild difficulty. Mr. Chancy was able to get on and off the exam table as well as up and out of the chair with mild difficulty." (Doc. 8-9, p. 101). Dr. Harris stated that Mr. Chancy's gait was slow, and he favored his right leg "secondary to left hip pain." (Doc. 8-9, p. 102). Dr. Harris noted that Mr. Chancy used a cane, his walking heel-to-toe was normal, and his walking on his toes and heels was poor secondary to his left hip pain. (Doc. 8-9, p. 102).

On January 8, 2014, Dr. Robert Estock, a state agency medical consultant,

conducted a residual functional capacity evaluation.  He found that Mr. Chancy could perform light work, except that he could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, and he could not climb ropes, ladders or scaffolds.  Additionally, Dr. Estock found that Mr. Chancy could occasionally perform overhead reaching with his right arm but could not overhead reach with his left arm.  (Doc. 8-4, pp. 10-15).

On January 21, 2014, Mr. Chancy visited Dr. Sovic to discuss a "repeat block." (Doc. 8-9, p. 542).  Dr. Sovic's notes reflect that Mr. Chancy stated that he was doing well on his medicines that included Ambien, Tylenol #3, and Zanaflex. Dr. Sovic continued Mr. Chancy on his medications and informed him that he could have a block in the future if it was necessary.  Dr. Sovic scheduled Mr. Chancy for a follow-up visit three months later, (Doc. 8-9, pp. 125-26), but Mr. Chancy returned to see Dr. Sovic on February 20, 2014, for another lumbar epidural block, (Doc. 8-9, p. 127).  An April 15, 2014 visit with Dr. Sovic evidenced continued low back and left hip pain.  (Doc. 8-9, p. 123).  Dr. Sovic noted that Mr. Chancy was experiencing "lumbago," "pain of thoracic spine," and "disorders of sacrum."  (Doc. 8-9, p. 124). On June 19, 2014, Mr. Chancy went to Dr. Sovic for another block.   During his pre-procedure assessment, Mr. Chancy reported that the last block had helped for "11 days" and he felt the "[b]est he had in the last two years."  (Doc. 8-9, pp. 116-22).

Mr. Chancy returned to see Dr. Sovic on July 8, 2014 for a medicine check.

Dr. Sovic again noted muscle aches, lumbar spine pain, and joint pain and swelling. (Doc. 8-9. p. 114). Dr. Sovic continued Mr. Chancy on his medications and scheduled Mr. Chancy for a follow-up visit in three months.  (Doc. 8-9, p. 114).  Dr. Sovic requested lumbar spine and thoracic spine MRIs, which were conducted on July 18, 2014. (Doc. 8-9, p. 217).   The lumbar spine report states that the MRI showed "old compression fractures at T11 and T12 levels" that "compresses the underlying cord" causing "mild to moderate central canal stenosis," "shallow broad-based disc bulge with left paracentral annular rent" at L1-L2; "Schmorl's node defects along the inferior aspect of L2 and superior aspect of L3"; "broad-based disc bulge" and "mild central canal and bilateral recess stenosis" at L3-L4; "foraminal disc bulges" producing "mild central canal and bilateral lateral recess and foraminal stenosis" at L4-L5; and a "shallow disc bulge" at L5-S1; leading to an overall impression of "old T11 and T12 compression fractures" and "multilevel disc disease as described." (Doc. 8-9, p. 217).   The thoracic spine report states that the MRI showed a "small central disc herniation" at T7-T8; "Schmorl's node defect" at T9-T10; "compression deformity of the superior end plate of T11"; and "degenerative disc disease at the T12 level"; leading to an overall impression of "old appearing compression fractures involving T11 and 12 as described," "retropulsion and posterior osteophyte formation at the T11 level which produces mild to moderate central canal stenosis and abuts the underlying cord," and "multilevel disc disease as

27

described." (Doc. 8-9, p. 218).

While Mr. Chancy received treatment for his back pain, he sought medical treatment for a variety of other conditions. Mr. Chancy began treatment with Dr. Mosley on July 16, 2012. Dr. Mosley diagnosed Mr. Chancy with lymphadenopathy, hyperlipidemia, hypertension, and vertebral fracture. (Doc.8-8, pp. 12-13). Dr. Mosley noted that Mr. Chancy was using a back brace for support. Dr. Mosley scheduled Mr. Chancy for a follow-up visit in six months. (Doc. 8-8, p. 13).

Dr. Mosley saw Mr. Chancy on April 16, 2013. Mr. Chancy's chief complaint was low back pain. Dr. Mosley noted that Mr. Chancy's neck injury was causing him arm pain and numbness in his left arm. (Doc. 8-8, p. 14).

Mr. Chancy visited Dr. Mosley on October 3, 2013, complaining of high blood pressure associated with chronic pain. (Doc. 8-9, p. 108). Dr. Mosley continued Mr. Chancy on his medications and scheduled him for a return visit in four months. (Doc. 8-9, p. 109).

On April 9, 2014, Dr. Mosley treated Mr. Chancy for "aching," "stabbing," "severe," "all day" back pain "from [his] scapula down to lumbar spine" as well as severe nausea. (Doc. 8-9, p. 106). Dr. Mosley continued Mr. Chancy's medications and scheduled him for a return visit in four months. (Doc. 8-9, p. 107).

On August 26, 2014, Dr. Mosley provided a sworn statement as Mr. Chancy's

treating physician.  Dr. Mosley stated that a treating physician is "able to see over a period of time what effect the patient's illness is having upon their general health, their ability to perform their daily tasks, their work, etc." (Doc. 8-9, p. 201).  Dr. Mosley explained that Mr. Chancy had a complicated medical history.  (Doc. 8-9, pp. 203-04).  Dr. Mosley stated that Mr. Chancy was not a malingerer because Mr. Chancy consistently followed medical advice.  (Doc. 8-9, p. 208).   Dr. Mosley opined that Mr. Chancy's problems were "not something he will overcome" and that he "suspect[s] [Mr. Chancy] will be left with chronic pain and impairment and not be able to function because of it." (Doc. 8-9, p. 209).

Dr. Mosley completed a Functional Capacity Assessment form concerning Mr. Chancy.  (Doc. 8-9, pp. 213-15).  Dr. Mosley indicated that Mr. Chancy could sit continuously for two hours and stand or walk continuously for one hour during an 8-hour workday.  Because of his impairments, Mr. Chancy would need to lie down for approximately three hours, (Doc. 8-9, p. 214), and Mr. Chancy could be expected to miss a total of 100 days of work each year, (Doc. 8-9, p. 215).

Dr. Mosley concluded that Mr. Chancy could not make it through a full eight-hour workday five days a week.  (Doc. 8-9, pp. 206-07).   Dr. Mosley stated that his findings were based on objective information and diagnostic testing.  (Doc. 8-9, pp. 204-05).  Dr. Mosley stated that Mr. Chancy's reports (that his pain level was a 7/10 or 8/10 despite medication, that he could not sit, stand, or walk for more than ten or

fifteen minutes at a time, that he must lie down for at least three hours of the day, and that his sleep was poor) were consistent with the history Mr. Chancy had given. (Doc. 8-9, pp. 205-06).

There is a gap in Mr. Chancy's medical records between 2014 and 2017. According to a July 14, 2017 record, Mr. Chancy visited Whatley Health Services on that date for "follow up of Back pain, follow up of Hypertension and Depression." (Doc. 8-15, p. 7). With regard to back pain, Dr. Jennifer Miller noted that Mr. Chancy's pain had started four years earlier. (Doc. 8-15, p. 4). Mr. Chancy reported moderate to severe pain in his lower back that radiated to his left foot, describing the pain as "ache burning, shooting, and stabbing." Dr. Miller wrote that Mr. Chancy's pain was aggravated by, "ascending stairs, bending, descending stairs, sitting, standing, twisting, and walking. Mr. Chancy rated his back pain as 7/10. (Doc. 8-15, p. 9). Dr. Miller wrote that while Mr. Chancy received relief from pain medication, the pain medication he was "on only relieve[d] his pain less than 25%." (Doc. 8-15, p. 7). Mr. Chancy reported that he needed "refills of meds." Dr. Miller noted that Mr. Chancy's hypertension was stable. (Doc. 8-15, p. 7). Mr. Chancy reported that he experienced depression associated with his "chronic pain (low back), headache, irritability and trembling." (Doc. 8-15, p. 1). A note regarding Mr. Chancy's vital signs indicates that his height was "Last Measured 07/14/2016." (Doc. 8-15, p. 12). To manage his back pain, Dr. Miller instructed Mr. Chancy to

continue Zanaflex, Ultram, and Lyrica.  (Doc. 8-15, p. 9).  Dr. Miller asked Mr.
Chancy to schedule a follow-up visit in one month.  (Doc. 8-15, p. 10).

On November 17, 2017, Mr. Chancy had a follow-up visit with Dr. Miller.
(Doc. 8-15, p. 11).  Mr. Chancy presented with chronic pain, hypertension, GERD,
and knots on his back and right arm.  Mr. Chancy reported that Cymbalta did not
help much with pain or depression, that his pain level was 10/10, that he was out of
Protonix and could not afford more, that he was not taking Ultram or Zanaflex, and
that he had fallen two weeks earlier and landed on his right arm. (Doc. 8-15, pp. 11-
12).  Dr. Miller's physical exam revealed that Mr. Chancy exhibited reduced range
of motion of lumbar spine, muscle spasms, and possibly a torn tendon in his right
arm above the elbow.  Dr. Miller recommended that Mr. Chancy visit an orthopedist;
he replied that he had no insurance and could not afford to see an orthopedist.  (Doc.
8-15, p. 13).  Mr. Chancy received UAB charity care paperwork.  (Doc. 8-15, p. 13).
Dr. Miller directed Mr. Chancy to continue his medications for back pain, reflux,
and hypertension.  Dr. Miller asked Mr. Chancy to try Zoloft for depression and to
follow-up in two months. (Doc. 8-15, p. 13).

Mr. Chancy visited Dr. Miller again on March 9, 2018 for hypertension and
back pain.  (Doc. 8-15, p. 15).  Many of Mr. Chancy's symptoms were unchanged.
He described his pain as an 8/10, and his functional status had not changed.  Dr.

Miller directed Mr. Chancy to continue his medications and noted that Mr. Chancy was considering pain management.  (Doc. 8-15, pp. 17-18).

*Mr. Chancy's Administrative Hearing Testimony*

Mr. Chancy's administrative hearing took place on November 27, 2018. (Doc. 8-10, p. 44).  Mr. Chancy testified that he was 56 years old and that he had completed was the 12th grade.  He testified that he received special education in school.  (Doc. 8-10, p. 52).

Mr. Chancy attested "my whole body hurts…from my neck all the way down to my toes in my left foot."  He explained that his back was constantly in pain and that most of the time his left hip and leg were numb.  Mr. Chancy testified that his left leg would give out, causing him to fall, and a metal plate in his neck made it difficult for him to turn his neck.  Mr. Chancy explained that he had worked most of his life since the age of 14, so he was not accustomed to being in a constant state of pain and hated being that way.  (Doc. 8-10, pp. 52-53).

Mr. Chancy stated that on a typical day, he did exercises, washed dishes, picked up sticks out of the yard with a grabber, and cut the grass on a riding mower for short periods of time.  He explained, that he could do things one day but could not accomplish the same activities the next day.  (Doc. 8-10, pp. 54-55).  Mr. Chancy testified that he rested for up to six or seven hours a day between the hours of 8:00

to 5:00.  Although it hurt to lay down, Mr. Chancy testified that on his worst days, he laid down quite a bit.  (Doc. 8-10, pp. 55-56).

At his best, Mr. Chancy believed he could walk 10 to 15 minutes before stopping to rest.  Mr. Chancy believed he could sit continuously for up to 25-30 minutes.  Then, he needed to stand or walk.  (Doc. 8-10, pp. 59-60).  Mr. Chancy testified that he did not drive unless he had to and did not drive when he was in a lot of pain because sitting in a car increased the pain.  (Doc. 8-10, p. 56).

When asked about his pain level on a typical day, Mr. Chancy stated that there have been several times he wanted to go to the emergency room because of his pain, but he "just didn't want to bother anybody to take [him], and he didn't want to call an ambulance."  (Doc. 8-10, p. 56).  On most days, he explained, his pain level is around a seven or eight with medication.  (Doc. 8-10, p. 57).  Without medication, his pain level is ten or higher.  (Doc. 8-10, p. 57).  Mr. Chancy explained that his medication caused him to be sleepy, although he only slept about two hours most nights because of pain.  (Doc. 8-10, p. 57).

Mr. Chancy testified that his friend Sandy helped him around the house.  When Sandy was not working, she cooked his supper, washed dishes, and cleaned around the house.  (Doc. 8-10, p. 58).  Mr. Chancy testified that during the week, he cooked for himself sometimes, but for the most part, he ate sandwiches and meals that were easy to fix.  (Doc. 8-10, p. 59).  His daughter drove him to the grocery

store, helped around the house, and prepared meals when necessary.  (Doc. 8-10, p. 59).

Mr. Chancy testified that he did not recall not seeing doctors between 2014 and 2017.  (Doc. 8-10, p. 46).  He believed he had visited Whatley Clinic before July of 2017, but he could not remember the exact dates.  (Doc. 8-10, p. 45).  The ALJ indicated that the records before her showed that Mr. Chancy received treatment at Whatley for the first time on July 14, 2017, assuming that Mr. Chancy's attorney ordered all of Mr. Chancy's records.  (Doc. 8-10, p. 46).  The ALJ remarked:  "the only records that I can go on are the records that are in the file."  (Doc. 8-10, p. 46).

When questioned about the fact that he tested positive for Percocet and Lortab at his last visit with Dr. Sovic, Mr. Chancy explained that he had taken some old medication that had been prescribed to him.  (Doc. 8-10, p. 48).  The ALJ asked Mr. Chancy whether he stopped seeing Dr. Sovic because he changed his Tylenol #3 to Ultram.   Mr. Chancy stated that he stopped seeing Dr. Sovic because he had explained to Dr. Sovic for "a year to a year and a half" that the medication he prescribed "was not doing me any good" and made him sick to the stomach.  (Doc. 8-10, p. 49).  Because Dr. Sovic would not change his medication, Mr. Chancy stated that he had to find a new doctor or "keep being sick and throwing up from the medicine he was giving me."  (Doc. 8-10, p. 49).  Mr. Chancy testified that the

34

medication that Dr. Sovic prescribed -- Ultram, Zanaflex, and Ambien, did not help his pain.  (Doc. 8-10, pp. 49).

The ALJ asked Mr. Chancy questions about his financial situation.  Mr. Chancy testified that he had no income.  (Doc. 8-10, p. 51).  The ALJ asked whether Mr. Chancy received $100,000, vocational rehabilitation, and a gym membership in his worker's compensation settlement.  Mr. Chancy testified that he did not go to the gym because he could not lift the weights.  (Doc. 8-10, pp. 46-47).  Mr. Chancy testified that he used the money he received from the worker's compensation settlement to repay money he had borrowed.  (Doc. 8-10, p. 51).

Mr. Chancy testified he did not have insurance and could not afford to go to the doctor.  (Doc. 8-10, p. 53).  He explained that he tried to apply for charity care with UAB, but he could not apply because he did not have a birth certificate.  He explained that he applied for his birth certificate from Springfield, Illinois but that he had not received it, though he had applied for it over two years earlier.  (Doc. 8-10, pp. 50-51).

Ms. Stroud, a vocational expert, testified that in the past, Mr. Chancy drove dump trucks.  (Doc. 8-10, p. 60).  Mr. Chancy stated that he used to haul gravel or asphalt in dump trucks.  (Doc. 8-10, p. 60).  Ms. Stroud stated that, in his last position, Mr. Chancy was a truck driver and a materials handler.  The ALJ posed a hypothetical about a person with Mr. Chancy's education, training, and work

experience, limited to a full range of light work with the limitations of: "no climbing of ropes, ladders, or scaffold. Must avoid overhead reaching with the bilateral upper extremities. Would need to avoid concentrated hot or cold temperature extremes or extreme vibration. And would need to avoid unprotected heights." (Doc. 8-10, p. 62). The ALJ asked whether there were jobs in the national economy that the person could perform. (Doc. 8-10, p. 62). Ms. Stroud testified that the person could perform the work of a garment sorter, a filler, or a seconds handler. (Doc. 8-10, p. 62).

When asked whether there were jobs in the national economy for another individual with Mr. Chancy's qualifications and limitations and who needed to miss work for two or more days per month on a consistent basis, Ms. Stroud testified that there were no jobs available. (Doc. 8-10, p. 63).

*Mr. Chancy's Onset Date*

Mr. Chancy argues that the ALJ wrongfully rejected his alleged onset date of January 3, 2012. (Doc. 14, p. 31). Mr. Chancy contends that the ALJ tied his onset date to his first visit to Dr. Miller on July 14, 2017, but "all of the symptoms in the same degree" were documented previously by his treating and consultative physicians. (Doc. 14, pp. 31-32). The Court agrees.

The record demonstrates that Mr. Chancy consistently reported an onset date of January 3, 2012. He reported that date in his original application for disability benefits, and he reported that date in his 2018 application for SSI benefits. Though

36

the Court cannot find Mr. Chancy's 2016 application for disability benefits and SSI, it stands to reason that Mr. Chancy alleged a 2012 onset there too because he reported to Dr. Miller in July of 2017 that he had begun experiencing back pain four years earlier.  (Doc. 8-15, p. 4).

Mr. Chancy was taking Lyrica, Ultram, and Zanaflex for back pain when he visited Dr. Miller in 2017.  (Doc. 8-15, p. 8).  He explained to Dr. Miller that he needed refills for his medication.  (Doc. 8-15, p. 7).  He also stated that his medication provided only minimal relief, (Doc. 8-15, p. 7), a report that he had made for years, first to Dr. Banks and then to Dr. Sovic, (*see*, *e.g.*, Doc. 8-9, p. 153).

On July 14, 2017, Mr. Chancy rated his pain at 7/10.  (Doc. 8-15, p. 9).  He had rated his pain at 6/10 in April of 2012, (Doc. 8-8, p. 34); 7/10 in August of 2012, (Doc. 8-9, p. 182); 7/10 in October 2012, (Doc. 8-9, pp. 161-62); and 8/10 in April of 2013, (Doc. 8-9, p. 153), just to name a few pain ratings.  In July of 2017, when he was not taking two of his three pain medications, Mr. Chancy rated his pain at 10/10.  (Doc. 8-15, p. 11).  He rated his pain as 10/10 in August of 2013.  (Doc. 8-8, pp. 38-39).

Mr. Chancy told Dr. Miller that his back pain was persistent.  (Doc. 8-15, p. 7).  In October of 2012, Dr. Sovic noted that he had been treating Mr. Chancy for more than three months, that Mr. Chancy had received three blocks, and that Mr. Chancy had achieved only intermittent pain relief.  Dr. Sovic stated that he did not

have suggestions for pain relief for Mr. Chancy other than pain medication and blocks. (Doc. 8-9, pp. 161-62). Dr. Mosely opined that Mr. Chancy suffered from chronic pain. (Doc. 8-9, p. 209). Substantial evidence in the record supports that opinion. Dr. Banks concluded in August of 2013 that Mr. Chancy no longer needed to visit him, not because Mr. Chancy's pain had improved but because there was nothing else that Dr. Banks could do for Mr. Chancy because from a "cervical standpoint," Mr. Chancy had reached "maximum medical improvement." (Doc. 8-8, p. 159).

The ALJ found that "after 2014, the claimant received no further treatment, which suggested the claimant's symptoms had resolved to the degree that he did not require ongoing treatment." (Doc. 8-10, p. 28). This finding is flawed for several reasons. First, at his 2018 administrative hearing, when the ALJ asked Mr. Chancy why he had not received medical treatment between 2014 and 2017, Mr. Chancy replied: "I don't recall not seeing any doctor." (Doc. 8-10, p. 46). Second, when Mr. Chancy visited Dr. Miller in 2017, he was taking prescription medication, and he indicated that he needed refills. Mr. Chancy could not be taking prescription medication in 2017 if he had not seen a doctor since 2014. Third, the ALJ stated: "the only records I can go on are the records in the file," (Doc. 8-10, p. 46), but that is an incorrect statement of the law.

38

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (citing *Richardson v. Perales*, 402 U.S. 389, 400–01 (1971)).  "Few, if any, agency adjudications depart more markedly from the adversarial customs that define the American legal tradition than do SSA hearings.  In processing disability claims, the ALJs do not simply act as umpires calling balls and strikes.  They are by law investigators of the facts, and are tasked not only with the obligation to consider the reasons offered by both sides, but also with actively developing the record in the case."  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018).  To be sure, "claimants must establish that they are eligible for benefits," but an ALJ "has a duty to develop the record where appropriate . . . ."  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007) (citing *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001)).

Because it is apparent that Mr. Chancy received medical care for his back pain between 2014 and 2017, the ALJ had a duty develop the record concerning that treatment.  Importantly, the Appeals Council directed the ALJ to consolidate Mr. Chancy's September 2013 application for disability benefits with his April 2016 application for disability benefits and SSI and examine together "the claims files, associate the evidence, and issue a new decision on the consolidated claims," (Doc.

39

8-11, p. 75), but the Court does not see a mention of the 2016 application or evidence associated with that application in the ALJ's January 2019 opinion, (Doc. 8-10, pp. 22-34).[9]  And, as noted, the Court cannot find the 2016 application in the record. That record, if it exists, may include medical evidence concerning Mr. Chancy's treatment after 2014.

The ALJ erred in her application of the law, and she failed to adequately develop the record to determine the proper onset date for Mr. Chancy's disability. Therefore, the Court must reverse the ALJ's decision.[10]

## Conclusion

For the reasons discussed above, the Court remands the decision of the Commissioner for further administrative proceedings consistent with the Court's memorandum opinion.

**DONE** and **ORDERED** this September 30, 2021.

_Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[9] As noted, during the 2018 administrative hearing, the ALJ asked Mr. Chancy why he had not filed an application for SSI.  (Doc. 8-10, p. 53).  If the Appeals Council correctly indicated that Mr. Chancy applied for SSI in 2016, then the ALJ seems to have overlooked that application, an application which included a renewed application for disability benefits.  The Court notes that the definition of disability is the same for purposes of disability insurance and SSI.

[10] The ALJ will be in a better position to evaluate Dr. Mosely's opinion when the ALJ has a complete set of Mr. Chancy's medical records.